We're going to hear argument next in the field 1560 from 2007, Randrop v. Spectranetics. Corbis, we're ready to proceed as soon as you are ready. Okay, thank you. Good morning, Your Honors. This is a patent case involving a product called laser, involving a laser angioplasty, laser catheters. The first issue on appeal arises from the implications of the KSR case, which was decided about five months after this case was in trial and the jury verdict was rendered, and about three months after all post-trial briefings were done. The KSR case, as the Court knows, modified the obviousness standard. Maybe. Maybe. At least I think in the following relevant ways. Using different words. Whether it changed the standard is a debatable thing. Well, I think that at a minimum, the Supreme Court said that the TSM standard isn't required. What you're saying is that it clarifies the standard. Fair enough. Let me ask you, Mr. Corbis, did your client draw the KSR decision with the intention of driving it? No, it didn't, Your Honor. It had several months within which time to do that. Well, the KSR case was decided in April. The jury verdict was rendered in December 2006. All post-trial briefing was completed by January or February of 2007. The KSR decision was in April 2007, and the judge rendered his post-trial motion decisions in August. While the case was under submission, if there was a change in the law, as you contended, wasn't your client obligated to draw this change in the law to the attention of the project? No, Your Honor. I don't believe it was. There's an issue here. There was no post-trial briefing or motion made on the obviousness issue. Well, why couldn't you have made a motion a week after the KSR decision came down? And said, Judge, look, the whole law has changed. We've got to revisit this jury verdict. We've got to have a new analysis of the instructions. There may be a violation of Supreme Court holding here. But you didn't do that. So it's not fair to me you can fairly be said to have preserved your right to complain now. Well, Your Honor, I don't know that there's any precedent. We didn't find any in the site by the opponent, and we didn't find any that requires us to file a motion after the case has been decided and all the briefing schedule has been completed. The case wasn't decided? I'm sorry. The jury verdict was rendered, and the post-trial briefing was all completed. This issue wasn't before the court on post-trial motions. I don't find any precedent. If you're correct, if you're correct that KSR has changed the law and that under KSR this decision cannot stand, if you had brought that to the attention of the district court, the district court might well have changed its decision, and we'd never have to consider this appeal. The district court would have had to consider post-trial motions on the jury verdict, because the district court didn't make any decisions because there was no post-trial motions, because, quite frankly, the jury instructions that were given at the time were consistent with existing case law, and there were two instances that we believe changed under KSR, making the jury instructions inappropriate. Why are those jury instructions inappropriate in light of KSR? The two jury instructions that were inappropriate was that the district court specifically said that the obvious-to-try standard is not satisfactory, is not applicable. The Supreme Court in KSR said that obvious-to-try can be used. It is a test for obviousness. And specifically, the jury instruction that the district court gave can be found at page 33 of our brief, our initial brief. It says, you must also keep in mind that the test for obviousness is not whether or not it would have been obvious-to-try to make the invention. So it explicitly prohibited the jury from applying an obvious-to-try standard, which the Supreme Court in KSR says can be used, is one of the options that can be used to test for obviousness. The other thing the district court did was- What exact language are you referring to in KSR? You have to be a little precise here. Okay. In KSR, a couple of things. KSR says that an invention is likely obvious if it recites nothing more than, one, a use of known elements, two, according to established functions, three, to achieve predictable results. None of that relates to the jury instruction language you just read. Well, let me follow up. Where's the conflict between a statement in the KSR opinion and the jury instruction language you just read? There's another portion of the KSR decision that I'd like to go to. KSR decision says, when there's a design need or market pressure to solve a problem, and there are a finite number of identified predictable solutions, a person of ordinary skill has good reason to pursue the known option within his or her technical premises. Again, where's the clash between the jury instruction language and that KSR one? I don't see any inconsistency. They speak to different aspects. Well, Your Honor, I believe that the KSR case, and perhaps you can find another quote from our brief. I know that we have quoted to the KSR case specifically with page numbers, allows an obvious to try standard, which was prohibited. That's one of the things that the KSR case provided. To follow up a minute on what General Cook said, is there any language that you would point to in the KSR that says, henceforth and from now on, obvious to try is a permissible basis for determining obviousness? Is there any language that says so strictly, or are you inferring from other statements that actually the court must have intended? Give me one second. I'll let you know if I have a quote for you. You will agree, won't you, that no jury instruction was in any of the KSR cases. It wasn't about jury instructions. There was no jury instruction under review. We agree, Your Honor. That's not the issue, but the issue under cases that you have looked at post-KSR, where this issue has come up, that is, KSR was decided after the court, the jury verdict. You have looked at whether or not the jury instructions, one, were consistent with KSR, and if they were inconsistent, did it have an effect, given the evidence that was presented? That's why Judge Friedman is asking you, where's the precise inconsistency? Right. I can't give you the quote. I can give you the citation to the case where we believe the obvious to try standard was approved by the Supreme Court. And that's at KSR 127, Supreme Court at 1742. What does it say? Does it say that? I'm sorry, Your Honor. I can't give you the quote. I don't have it in the brief. That is the case. What I want to find out from you is, did the Supreme Court explicitly say that, or is this an inference you have drawn from everything else the court said? My understanding of KSR, my recollection of the specific language of KSR, is that the KSR case specifically said that obvious to try is a test. Now, that's part of the obviousness protocol. I don't think that you're correct. I think that what Justice Kennedy's opinion said was that if an application was obvious to try, it might be obvious. But it might not be obvious. So I don't think it's fair to say that means there's a new test for obviousness. It's under the label obvious to try. But, Your Honor. He wasn't announcing it. He was just announcing a sometime correlation. Sometimes, if it's obvious to try, it will be held obvious in fact. Other times, if it's obvious to try, it won't be held obvious in fact. That doesn't seem to me to be anything close to a test. Well, Your Honor, I mean, if that's even a test. A test has to discriminate. A test has to tell you what the right result is. So when Kennedy says, well, sometimes obvious to try will lead to a conclusion of obviousness. And other times, it won't. That's telling you it's not a test because it doesn't dictate the outcome. It's a factor to be considered. Well, and at least let me say this then. I mean, the jury instruction that we're looking at says you must also keep in mind that the test for obviousness is not whether or not it would have been obvious to try to make the invention. That's not obvious. In other words, if that's saying is that obvious to try is not the spot, what interpretation is that? Well, another interpretation, I think, is that it is a prohibition against using the obvious to try test. I mean, Justice Kennedy, to the extent that that's what he said, at least it is a factor to be considered. I believe it is jury instruction. But the question for us is, I think, that however one interprets the Supreme Court opinion, can one fairly say that the jury instructions in the light, all of the jury instructions, not just the particular sentence, that the jury instructions as a whole were inconsistent with the standard for determining obviousness that was an act to approve the KSR? Well, that's the question for us. And you can't always fully answer that by just saying, well, let me read to what the court told the jury here, and then you read the sentence. Because you have to look at the overall impact of the total instruction. I understand, and I agree with that. And of course, the opinions that you've been involved in on this issue, absolutely, that's the test. But we believe that given the overall instructions, that at least what we're seeing here is an instruction to the jury not to consider obvious to try. And that's what we have in this situation. If we supposedly were persuaded that there was at least a portion of the instruction that was erroneous, where is the prejudice to you? Where is the harm from that statement of the law that perhaps is no longer reliable? Well, the harm is this. This is perhaps one of the best obvious to try cases that I've seen, whether reported or not. This is a situation where on the facts that were presented at court in trial, spectrometrics has a line of catheters, all with different diameter tips, all otherwise substantially the same in construction. They have a 2 millimeter tip, a 1.7 millimeter tip, a 1.4 millimeter tip. The invention here, the claim invention, is the same as the 1.4, the 1.7, the 2.0, with one difference. The tip is less than 1 millimeter. So the only thing that was changed, and Dr. Redfrock concedes this in his testimony, is that they took the 1.4 millimeter catheter and reduced it in size to less than 1 millimeter. So if it's not obvious. You're now saying that forget about the jury instruction. On the evidence in the case, it's blatantly clear that this claim invention was obvious. But as I recall, you didn't make a Rule 50 motion for judgment as a matter of law that this claim invention was obvious. So why don't we, again, as Judge Walker's question earlier, Chief Judge Walker's question earlier indicated, why don't we have a waiver problem here? Why shouldn't we say you failed to preserve the merits argument with respect to obviousness by failing to file a post-trial j-mark? Because I believe that on the facts of this particular case, the jury instructions were such that, as we read them, don't consider obvious to try. That is not going to be sufficient, jury, for you to find obvious. It was just obvious to try. And that is the primary basis for our appeal. And then we believe that that was a fact that was changed by the KSR case. You may be right that if the instruction is substantially incorrect, and if you can show us that it caused a wrong result, that that much is preserved. But when you go beyond that to say, and besides, this invention couldn't result in a valid patent because the invention was blatantly obvious, I don't think on that last point you've preserved the right to complain on appeal. But our point on the last point, Your Honor, is this. On the merits, we have to demonstrate in these cases that there's prejudice, that there's a substantial amount of evidence. We believe that it was obvious to try to make a 0.9 or less than 1 millimeter tip. I understand your argument to be way beyond obvious to try. If you're to say it was obvious, period, that there's no meaningful difference between a 1.2 millimeter diameter tip and a 0.9 millimeter diameter tip. It's just a routine design choice. Anybody could do it. It wouldn't take any research. It wouldn't take any new insights. It's just a question of sizing. Well, that was certainly our argument at the district court level. And the jury obviously found differently. But on appeal, the issue is, was it obvious to try? We think that if presented with that option, that if it was obvious to try to move from a 1.4 to a 0.9 or less than 1 millimeter catheter tip, that the jury would have considered it differently. And that's our position. All right. We're a little short on time. So maybe you should get to other principal points. Okay. And then we'll give you a little bit of rebuttal time, even though you've actually considered all that. Let me move on to the next point. Just let me point this out. Dr. Rentrop, in his trial testimony, testified as following about the claim invention. And I quote. This is at 1860 in the appendix, page 293. I have used the old parts in a novel way to develop a novel product. It is not the parts which define this novel product that can all be old and used, but it's their combination. And he goes on to say at 1810 of the appendix, page 96, all that was required to develop the 0.9 millimeter catheter, which is the claim invention, was to modify the existing products. You could build on what was there. You didn't have to reinvent the wheel. And given the market pressures, the suggestion by Dr. Margolis in 1994 to, you know, that we could use a smaller catheter in the field, certainly we believe that modifying the 1.4 to a 0.9 or less than 1 millimeter catheter would have certainly been obvious to try. Let me move on to the issue of inequal conduct, because that's the – I'm going to go a little bit out of order. Keep in mind that we have your brief and no argument or citation is abandoned just because it can't be covered in a limited time here. I understand, Your Honor. On the inequal conduct side, it's related to the 1.4 millimeter primarily. Keep in mind this. The 1.4 millimeter is identical in all respects to the claim invention except that it is – the tip is 1.4 millimeters instead of less than 1 millimeter. As it stands, this case stands for the proposition that, in effect, you can whitewash – Tell us where Judge Castell, it looked like a very careful analysis of all of the issues you presented, committed a fundamental legal error. Where is the reversible error in his disposition of your arguments about inequitable conduct? The 1.4 millimeter – Judge Castell found that there was no material misrepresentation or omission with respect to the 1.4 millimeter catheter disclosure. He relied upon – it wasn't disclosed in the 90S, and it wasn't – a sample was not given to the examiner. What Judge Castell relied upon was a two-sentence reference in the background of the specification. What was in the background of the specification was merely a reference to the existence of a commercial product with a 1.4 millimeter catheter. Even if you get over – even if we were to assume that the District Court was in error in saying it wasn't material, what do you do with his finding that there was no intent to deceive, particularly since he said in his opinion that he found Dr. Rundrup to be a credible witness? Well, I think that you have to look at the cases on mental conduct from the last couple of years and the extreme – you know, the balancing that goes on with intent and materiality. No, no, no. There's no balancing unless threshold intent is found. He found no threshold intent. That's the end of the inquiry. There is no balancing state once he's found a lack of deceptive intent, as he did here. Well, I can only say that that's a – we believe that's a clearly erroneous finding given the facts, and the facts are that Dr. Rundrup and his attorney had the 1.4 millimeter catheter in their possession and affirmatively made the decision not to submit it as a sample to the Patent Office, instead to reference the existence of it. The question – there's no explicit evidence of intent. There's no – there's nothing – there's no witness who said when he heard Dr. Rundrup say, he said, I don't want to disclose that to the Patent Office because that might cause me some problems. You draw an inference. It seems to me from what he did, you draw the inference that he must have had an intent to deceive the Patent Office and the district court, refused to draw that inference, and said, looking at all the facts, including my determination that Dr. Rundrup was a credible witness and a witness on the other side was not a credible witness, everything considered, I find no intent. And that's a factual finding, and I find it very difficult to say that somehow it's clearly erroneous because you should have inferred. I also point out to you that you rely on a couple of cases from this court dealing with intent, but I believe in both of those cases that you relied on, the district court had found that there was no intent, and this court affirmed that finding, explaining why. It seems to me it's a big jump from that to say, well, for the same reasons now, the evidence not only would have justified the finding of intent, but compelled the finding of intent. That's what you have to say to prevail on this, is that on the evidence before the district court, the district court was required to find intent. That's what you have to establish, isn't it? It is, Your Honor, and I guess all we have is, as you said, we have to draw an inference of intent, and the only evidence in the record that there was no intent was from Dr. Rundrup's testimony. Your Honor, I have to say that there's no intent. The question is, what is it? There has to be evidence that would require the drawing of an inference of intent. I find that very difficult to draw that for us. The court of appeals to say that the district court committed a reversible error in failing so to infer. What is it basically? A factual inference. I understand the difficulty associated with it. Either it's impossible. I don't know that it's impossible, though. But I think that on these facts where Dr. Renshaw testified that he had the physical sample, he had to reconsider it but didn't submit it. What is so magic about the 1.4 diameter tip? I thought it was very well known in the art that there were numerous tips in the range of 1.0 to above 2.0. So the existence of a 1.4 tip is no big deal. There are all sorts of tips in this range. The only interesting thing is that there's nothing below 1.0. Well, to the contrary, Your Honor. What happened in the prosecution history was that the examiner found other references that had tips less than 1.0. What Dr. Renshaw argued during prosecution as the novel point is that the diameter of the tip was less than the diameter of the shaft, therefore making it more flexible than the stiffer shaft. Now, the 1.4 had that precise configuration. The 1.4 had a thicker shaft than the narrower tip. And so the very novel point that Dr. Renshaw argued repeatedly and got it allowed on was present in the 1.4 commercial embodiment. But it wasn't given to the examiner. It had nothing to do with it being 1.4. It had to do with the relative thickness of the shaft and the tip. Absolutely. And not in any particular ratio, but the fact that the shaft was thicker than the tip in any ratio. And the 1.4 had that configuration. But although they argued that as a point of novelty during prosecution, they never said, you know what, though? It's present in the 1.4 catheter that we didn't give to you. Now, it wasn't a publication. It's not something the examiner could easily find. It was a commercial embodiment that they had in their possession. Why do we assume the examiner couldn't find it? Well, we have no evidence that the examiner did find it. We have no evidence. I mean, if we're going to force examiners to, based upon a reference that there's a commercial embodiment of some catheter in the background, force the examiner to go out and do some sort of searching for all those commercial embodiments, I don't think that's the appropriate burden to put on the examiner when the applicant has a duty of candor. And the applicant knew that this physical characteristic that they were arguing for patentability was present in this device. And all they did to whitewash this commercial embodiment was to say, yes, a 1.4 millimeter catheter exists. But they didn't say, oh, yeah, it also has this physical characteristic that happens to be what we see as novel. All right. I think we understand your point. I think you'd better hear from the other side. 15 months is up to the time. Mr. Gibbons. Spectrum ethics addresses a plethora of issues which were not properly raised before this court, even because they were raised for the first time on a field where they were weighed. These first-time issues include the 103 obviousness instructions to the jury based on KSR. They include a suggestion by Spectrum Ethics that which ignores the grand charges that the jury instructions included and says providing TSM instruction only is in error. They include the position that figure two is an unplanned embodiment and that Dr. Sinofsky, who is our expert, his references to it confuse the jury. They suddenly allege for the first time a pattern of withholding which was never raised as such before the district court. And they suddenly ignore the jury's finding in Dr. Grintrop's status as a sole inventor and the lack of absence of derivation or misappropriation of trade secrets at all found by the jury and not appear to support its position on inequitable conduct. And finally, their obviousness position, which suddenly occurred on appeal, was supposed to be somehow enabled by the KSR decision. It seems pretty clear that under the Verizon versus Vonage case, if you don't bring a JMOL, it's not before this court. Obviously, if we agree with you on the waiver arrangements, we don't need to reach the merits. But assume for a moment that we're not going to accept the waiver arrangements. Give us your response on the merits, please. Sir, number one, the chronology, which I can list for the court, gave them ample time to bring KSR to the attention of the district court. Number two, because of that, this court shouldn't consider it. There's absolutely a lot of them. I'm asking you to respond on the merits. Assume that we don't find persuasive your waiver arguments, then what? Didn't the trial court tell the jury that it had to avoid using hindsight? It wasn't any consistent with KSR. No. Why not? The trial judge told the jury, by virtue of his instructions, that they could not use the patent in suit as a road map to reassemble the prior law. That was the instruction. To my knowledge, there is no problem with that. More importantly, the trial court's instruction said motivation for combination must be present. But that motivation may come from, and I'll quote, the common knowledge or common sense of the person of ordinary skill in the art without any specific hint or suggestion in a particular reference. He's not complaining about that language. I guess he likes that language. So you have to deal with the language he's complaining about, not the language he doesn't complain about in the instruction. The only instruction about hindsight was what I believe I said. They couldn't use the patent in suit as a road map to reassemble the prior law. And that's melded with common sense. Would you contend that the instructions comply with KSR's requirements? Yes, sir, I would. Why? Because there's no rigidity to these instructions. These are the relaxed form of instructions that KSR approved, and this court has approved subsequently. What about his argument about obvious to try being somehow approved of in the Justice Kennedy opinion, even though in our prior case law it seemed to be disapproved? He says that changed the law, that your instructions didn't correspond to it. I don't think I have to address that, Your Honor. It doesn't fit his case. The reason it doesn't fit his case is, as counsel told you, a doctor in 1994 said to Spectrumetics, we need a catheter with a smaller tip. They assigned their best and their brightest, a Sicily Hillsman, to design this project. This is the woman who had developed and obtained two patents for this laser wire. She certainly knew about the 1.4 because the 1.4 was a Spectrumetics product. Well, guess what? Her object was to reduce the size of the 1.4, and she failed. She had four months of it, and they canceled the project. She was laid off. But if it was obvious to try, the jury was firmly entitled to believe that if it was obvious to try, Spectrumetics tried it, and they couldn't do it. So that's my response. Obvious to try was before them, and Spectrumetics demonstrated by its own mouth, took the testimony that, well, maybe it was obvious to try, but it didn't work. So while the general thought might have been there. Well, under the jury instructions that were actually given in this case, could the jury be up to the jury to consider whether it would have been obvious to try this thing? I believe it would, Your Honor. The common sense instructions that I referred to before and the common knowledge that may be employed by one ordinary skill in the art would certainly seem to cover that. The instruction said that one ordinary skill in the art is assumed to know all prior art, and he may use his common sense and common knowledge to perform a function. Certainly, I think obvious to try falls within that purview. You want to say anything about the inequitable conduct argument?  The jury found that Dr. Weintraub was the sole inventor, and did not derive the invention from Mr. Taylor or Harlan, and did not misappropriate any Spectrumetics trade secret, including Taylor's drawings, the chicken bone experiment, the power level information, or anything else. In this case, more than 50 patents were cited in this reference, most of them cited by Dr. Weintraub to the examiner. In addition, during the prosecution, you will find in the discussion of power levels, the examiner, Dr. Weintraub referred the examiner to the Spectrumetics website to get an understanding. I don't understand to say that in this case more than 50 patents were cited, but that wouldn't be as positive as inequitable conduct if there was a 51st patent that was the most relevant prior art, and it was conceived. It doesn't depend on the numbers, it depends on the quality of what was not disclosed. What was disclosed was everything we knew about except cumulative materials. The allegation on the 1.4 not being disclosed, Judge Kistell found there was zero intent in that. Again, I'm referring to the fact that we cited the examiner to the Spectrumetics website so the examiner could look at their entire line. We cited more than 50 references. As I understood this before, because he had a much more important argument, he seemed to say, I thought, that in an argument made to the examiner during the prosecution, Weintraub's attorney suggested that the greater flexibility of his smaller diameter tip was an innovation, even though he knew, the inventor and the prosecutor by implication knew that the 1.4 diameter Spectrumetics tip had that same additional flexibility, and therefore it wasn't new. It's the combination of flexibility and pushability, Your Honor. What's going on, the catheter is inserted into the femoral artery around the wound. It is put up through the femoral artery and a lower portion of the aorta called the iliac into the major portion of the artery which enters the heart. The heart is roughly like my fist. If you'll take my veins and treat them as arteries of the heart, once the catheter goes into the artery, it has to be backed off and put into these arteries here. And that's where the blockage has to be. So effectively, you have a physician who's operating down here to get this catheter up into a very delicate location. It requires pushability, and the tip of that catheter has to be able to be pushed in through a tiny, tiny artery. Basically, we're talking about arteries whose size range from 1.5 millimeters to 3.5 millimeters. And as they branch, they get tinier and tinier. I like your point about the distinction between flexibility and pushability. How does that meet the assertion to the examiner, quoted by Mr. Forbus, an accurate assertion as to the novelty of his tip versus the tip that Spectrometics had in its 1.4 millimeter product? You remember, we cited more than five references to the examiner with catheters under a millimeter. It's just not a simple reduction of the diameter of one that leads to the combination of pushability and flexibility that's required in this claim. The claim mentions both. I agree with that. There was testimony in the case by Dr. Rintra. It was supported by our expert. It wasn't contested by Spectrometics that when you just reduce one, you can lose the flexibility or the pushability. And they both have to be adjusted. The testimony relates to having a tip that somebody's trying to push into a narrow portion of an artery, act like a flimsy piece of spaghetti. It just doesn't do the work. All right. Anything further? Yes. And inequitable conduct. The court made its determination on inequitable conduct. And for materiality, the court found either none or a very low level of materiality. It did the same for the intent and came out with comparative results. With respect to the 1.4 catheter, it found zero intent. On balancing, it was concluded that Dr. Rintra did not engage in inequitable conduct. Spectrometics has not shown that these findings on materiality or intent were clearly erroneous. And it has not shown the results of the balancing were an abuse of discretion. Underscore scientific versus origin grounds. It would seem that the law of this court requires that the law be denied. All right. Any questions? Sir? Time for the flag. Mr. Cooper, we'll give you two minutes for the rebuttal. Thank you, Your Honor. On the issue of inequitable conduct, the arguments made specifically to patent examiner on the issue of relative thickness of the shaft to the tip were as follows. And they're on page 11 of our brief. But it does say that lobe, one of the prior references, therefore lacks a reduced diameter tip so that claim language claims 1, 5, and 9 are not met. On page 8665 of the appendix, the advocate argued the present independent claims, however, further call for the elongated body to be configured to be more rigid and less flexible than the tip. Deckelbaum, the prior reference, fails to reveal such a concept with respect to its tip. Combining lobe and deckelbaum would still lack a reduced diameter tip. What they're arguing is that the thicker shaft relative to the narrower tip is what's novel. How do you get that? Well, as it relates to pushability, that pushability automatically comes from a thicker shaft and a reduced diameter tip. The patent itself says so. At A530, column 4, line 7 through 12, the patent says, the smaller tip segment is flexible and enhances the ability to negotiate bends within the arterial system, affording better and easier access to the site lesion. Since the remainder of the catheter, the shaft, may be thicker and thus more rigid, the resulting device provides enhanced push and torque characteristics. That's fair. And what they argued in the examiner was that novel feature. It was present in the 1.4 millimeter, and they didn't disclose that back to the examiner. That's material, and we believe that's the intent that's required as well. As it relates to the KSR case, we try – I mean, in fact, Spectronetics, in fact, did design a point of less than 1 millimeter catheter twice. Once in 1994. The only reason it didn't become commercial is for economic reasons. I don't understand that you're rebutting anything said by Mr. Gibbs. It sounds to me like you're just restating your arguments in your main argument, which I don't think is proper. The one thing I'm – You're restricted to responding to something he said that you hadn't already covered in your initial argument. I'm sorry, I thought the address to the pushability question was responding to him. He did talk about the 1994 project that it wasn't – it failed. It didn't fail. In fact, there was a 1.0 millimeter catheter designed in 1994 by Spectronetics by reducing their 1.4 millimeter catheter. The only reason it didn't become commercial is for financial reasons, and they kiboshed the project purely for financial reasons. All right. Thank you, Your Honor. Thank you both. Thank you. You may be able to hold your rebuttal.